No. 23-5248

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

**JOHN DOE #1,** *et al.,*

Plaintiffs-Appellees,

*vs.*

**WILLIAM B. LEE,** *et al.,*

Defendants-Appellants.

---

On appeal from the United States District Court
for the Middle District of Tennessee
No. 3:21-cv-590

---

**APPELLEES' CORRECTED OPENING BRIEF**

---

Edward M. Yarbrough
Jonathan P. Farmer
W. Justin Adams
SPENCER FANE LLP
511 Union Street, Suite 1000
Nashville, Tennessee 37219
Telephone 615-238-6300

Counsel for Appellees

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-5248            Case Name: John Doe #1, et al v. William Lee, et al

Name of counsel: W. Justin Adams, BPR # 022433

Pursuant to 6th Cir. R. 26.1, John Does #1-9
*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No

CERTIFICATE OF SERVICE

I certify that on _____ April 11, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ W. Justin Adams, BPR # 022433
Spencer Fane, LLP, 511 Union Street,
Suite 1000, Nashville, TN  37219

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

Table of Authorities .......................................................................... iv

Statement in Support of Oral Argument .......................................... xi

Statement of Jurisdiction ................................................................. xii

Statement of Issues .......................................................................... 1

Statement of the Case ...................................................................... 4

Summary of the Argument ............................................................... 26

Argument .......................................................................................... 29

I.     Defendants are proper parties. ................................................ 30

       A.     Plaintiffs have standing to sue Governor Lee. .............. 30

       B.     Governor Lee is a proper defendant under *Ex Parte Young* ....... 32

              1.     Defendants have waived sovereign immunity by
                     litigating this case to final judgment on the merits without
                     raising sovereign immunity. ................................... 32

              2.     Regardless of waiver, Governor Lee is a proper defendant
                     under *Ex Parte Young*. ........................................ 34

       C.     The district court's jurisdiction over Director Rausch was not
              limited because his enforcement authority is extensive and
              integral to the operation of the Act's regulatory scheme. .......... 36

II.    The Act applies retroactively to Plaintiffs. .............................. 39

       A.     Defendants waived any claim that the Act is not retroactive by
              conceding retroactivity below. ...................................... 39

i

B.  *Weaver* and *Miller* govern the standard for retroactivity............41

C.  *Vartelas* did not overrule the *Weaver*/*Miller* standard. ................42

    1.  *Vartelas'* footnote 7 is *dicta*....................................................43

    2.  *Vartelas' dicta* did not overrule *Weaver* or *Miller*. ...............46

D.  The Act is retroactive because it changes the legal consequences of Plaintiffs' pre-enactment offenses. ............................................47

III.  The district court properly examined the Act as a whole to determine whether it was punitive in effect.............................................................47

A.  To determine whether a law is punitive in effect, a court must examine the regulatory scheme as a whole.................................48

B.  The Act creates a single regulatory scheme. ...............................50

IV.  The district court correctly held that the Act's regulatory scheme is punitive in effect as a whole under *Snyder*. ...........................................51

A.  *Snyder*'s analysis of punitive effect is controlling precedent. ....52

B.  The Act resembles the traditional punishments of banishment, public shaming, parole, and probation. .......................................54

    1.  The Act's geographical restrictions resemble banishment. ........................................................................................55

    2.  The Act's classification scheme resembles shaming.........57

    3.  The Act's in-person registration and reporting requirements, geographical restrictions, and criminal sanctions resemble probation and parole..........................60

C.  The Act imposes affirmative disabilities and restraints.............62

D.      The Act seeks to incapacitate and deter offenders and imposes retribution for past acts. ...................................................63

E.      The Act has only a tenuous connection to its nonpunitive purpose and is excessive to that purpose. ....................................64

V.      The scope and terms of the permanent injunction are proper............67

A.      The Act was not subject to elision.................................................67

B.      The district court's injunction was sufficiently detailed. ...........68

C.      The district court properly weighed the public interest............69

VI.     The district court properly determined declaratory relief would complement injunctive relief. ...................................................................69

Conclusion........................................................................................................71

Certificate of Compliance ..............................................................................72

Certificate of Service ......................................................................................73

Designation of Relevant Documents............................................................74

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Artists Picture Corp. v. Rhodes,*
    679 F.2d 656 (6th Cir. 1982) ................................................................ 1, 26, 35, 36

*Am. C.L. Union of Kentucky v. McCreary Cnty., Ky.,*
    607 F.3d 439 (6th Cir. 2010) ................................................................ 46

*Am. C.L. Union of Nevada v. Masto,*
    670 F.3d 1046 (9th Cir. 2012) .............................................................. 56

*Barachkov v. Davis,*
    580 F. App'x 288, 299 (6th Cir. 2014) ................................................. 33

*Belleau v. Wall,*
    811 F.3d 929 (7th Cir. 2016) ................................................................ 56

*Berrios v. United States,*
    126 F.3d 430 (2d Cir. 1997) ................................................................. 49, 50

*Boler v. Earley,*
    865 F.3d 391 (6th Cir. 2017) ................................................................ 34

*Bremer v. Johnson,*
    834 F.3d 925 (8th Cir. 2016) ................................................................ 47

*Byrd v. Tennessee Wine & Spirits Retailers Ass'n,*
    883 F.3d 608 (6th Cir. 2018) ................................................................ 67

*Children's Healthcare is a Legal Duty, Inc. v. Deters,*
    92 F.3d 1412 (6th Cir. 1996) ................................................................ 38

*Cutshall v. Sundquist,*
    193 F.3d 466 (6th Cir. 1999) ................................................................ *passim*

*Dobbert v. Florida.*,
    432 U.S. 282 (1977)..........................................................................48

*Doe #1 v. Lee*,
    518 F. Supp. 3d.............................................................................59

*Doe v. Bredesen*,
    507 F.3d 998 (6th Cir. 2007)...................................................*passim*

*Doe v. City of Lafayette, Ind.*,
    377 F.3d 757 (7th Cir. 2004)..........................................................55

*Doe v. Dewine*,
    910 F.3d 842 (6th Cir. 2018)..............................................26, 38, 39

*Doe v. Haslam*,
    No. 3:16-CV-02862, 2017 WL 5187117 (M.D. Tenn. Nov. 9,
    2017) ..............................................................................4, 52, 53

*Doe v. Miller*,
    405 F.3d 700 (8th Cir. 2005)..........................................................56

*Doe v. Settle*,
    24 F.4th 932 (4th Cir. 2022)..........................................................56

*Doe v. Snyder*,
    449 F. Supp. 3d 719 (E.D. Mich. 2020) .........................................68

*Does #1-5 v. Snyder*,
    834 F.3d 696 (6th Cir. 2016)...................................................*passim*

*Does #1-9 v. Lee*,
    No. 3:21-CV-00590, 2023 WL 2335639 (M.D. Tenn. Mar. 2,
    2023) ...........................................................................*passim*

*Doughty v. Hammond*,
    341 S.W.2d 713 (1960) ................................................................48

*Edelman v. Jordan,*
  415 U.S. 651 (1974)...............................................................33

*Henderson v. Scott,*
  260 F.3d 1213 (10th Cir. 2001).............................................50

*Hill v. Blind Indus. & Servs. of Maryland,*
  179 F.3d 754 (9th Cir.)..........................................................33

*Himes v. Thompson,*
  336 F.3d 848 (9th Cir. 2003)..................................................50

*Keaton v. State,*
  372 S.W.2d 163 (Tenn. 1963) ................................................48

*Koch v. Vill. of Hartland,*
  43 F.4th 747 (7th Cir. 2022)...........................................43, 45, 46, 47

*Ku v. State of Tennessee,*
  322 F.3d 431 (6th Cir. 2003)............................................*passim*

*Lawson v. Shelby Cnty., TN,*
  211 F.3d 331 (6th Cir. 2000)..................................................32

*McGuire v. Marshall,*
  50 F.4th 986 (11th Cir. 2022)................................................56

*Miller v. Fla.,*
  482 U.S. 423 (1987).........................................................*passim*

*Puskas v. Delaware Cnty., Ohio,*
  56 F.4th 1088 (6th Cir. 2023)................................................40

*Reid v. Lee,*
  476 F. Supp. 3d.............................................................59, 60

*Russell v. Lundergan-Grimes,*
  784 F.3d 1037 (6th Cir. 2015)................................................35

*Seling v. Young,*
    531 U.S. 250 (2001)............................................................49

*Shaw v. Patton,*
    823 F.3d 556 (10th Cir. 2016).....................................56

*Smith v. Doe,*
    [538 U.S. 84 (2003),]..........................................*passim*

*Taylor v. Buchanan,*
    4 F.4th 406 (6th Cir. 2021)..........................................47

*United States v. Elk Shoulder,*
    738 F.3d 948 (9th Cir. 2013).....................................47

*United States v. Kruger,*
    838 F.3d 786 (6th Cir. 2016).....................................47

*Vartelas v. Holder,*
    566 U.S. 257 (2012)..........................................*passim*

*Vasquez v. Foxx,*
    895 F.3d 515 (7th Cir. 2018).....................................56

*Vitolo v. Guzman,*
    999 F.3d 353 (6th Cir. 2021).....................................69

*W.B.H.,* 664 F.3d 848 (11th Cir. 2011)............................56

*Weaver v. Graham,*
    450 U.S. 24 (1981)..........................................*passim*

*Whole Women's Health v. Jackson,*
    142 S. Ct. 522 (2021)....................................36, 37

*Ex Parte Young,*
    209 U.S. 123 (1908)..........................................*passim*

**Statutes**

28 U.S.C. § 1331 ..................................................................... xii

28 U.S.C. § 2201(a) ................................................................. 70

42 U.S.C. § 1983 ........................................................ xii, 24, 36

Tenn. Code Ann. § 8-47-101 .................................................. 31

Tenn. Code Ann. § 8-47-109 .................................................. 31

Tenn. Code Ann. § 39-13-302 ................................................... 9

Tenn. Code Ann. § 40-39-201 ................................................ 63

Tenn. Code Ann. § 40-39-202 ........................................ *passim*

Tenn. Code Ann. § 40-39-203 ........................................ *passim*

Tenn. Code Ann. § 40-39-204 ......................... 10, 19, 51, 61

Tenn. Code Ann. § 40-39-206 ..................................... 17, 51

Tenn. Code Ann. § 40-39-207 ..................................... 10, 14

Tenn. Code Ann. § 40-39-208 ............................. 10, 18, 51

Tenn. Code Ann. § 40-39-211 ........................................ *passim*

Tenn. Code Ann. § 40-39-213 .................................................. 14

Tenn. Code Ann. § 40-39-217 .................................................. 19

Tenn. Code Ann. § 55-50-353 .................................................. 14

**Constitutional Provisions**

Tenn. Const. Art. X, Sec. 1 ..................................................... 31

## Other Authorities

1994 Tenn. Pub. Laws, ch. 976 ...................................................................4, 5, 6

2004 Tenn. Pub. Laws, ch. 921 ..........................................................................8

Fed. R. Civ. P. 57 ...............................................................................................70

Fed. R. Civ. P. 65 .........................................................................................69, 70

1996 Tenn. Pub. Acts, ch. 834 ...........................................................................6

1997 Tenn. Pub. Acts, ch. 455 ...........................................................................6

1997 Tenn. Pub. Acts, ch. 461 ...........................................................................6

1997 Tenn. Pub. Acts, ch. 466 ...........................................................................6

2000 Tenn. Pub. Acts, ch. 882 ...........................................................................6

2000 Tenn. Pub. Acts, ch. 997 .......................................................................6, 7

2002 Tenn. Pub. Acts, ch. 469 ...........................................................................7

2003 Tenn. Pub. Acts, ch. 95 .............................................................................8

2005 Tenn. Pub. Acts, ch. 316 .........................................................................10

2006 Tenn. Pub. Acts, ch. 890 .........................................................................11

2007 Tenn. Pub. Acts, ch. 126 .........................................................................11

2007 Tenn. Pub. Acts, ch. 531 .........................................................................11

2008 Tenn. Pub. Acts, ch. 979 .........................................................................11

2008 Tenn. Pub. Acts, ch. 1164 .......................................................................11

2009 Tenn. Pub. Acts, ch. 597 .........................................................................11

2010 Tenn. Pub. Acts, ch. 1138 .......................................................................12

2010 Tenn. Pub. Acts, ch. 1145 .............................................................12

2011 Tenn. Pub. Acts, ch. 266 ...............................................................12

2011 Tenn. Pub. Acts, ch. 287 ...............................................................12

2014 Tenn. Pub. Acts, ch. 751 ...............................................................12

2014 Tenn. Pub. Acts, ch. 770 ...............................................................12

2014 Tenn. Pub. Acts, ch. 992 ...............................................................12

2015 Tenn. Pub. Acts, ch. 516 ...............................................................13

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

This case presents difficult and important questions about how to apply the Ex Post Facto Clause generally and particularly to sex offender registry schemes under *Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016). Plaintiffs submit that oral argument would aid the Court's determination of these questions.

## STATEMENT OF JURISDICTION

Plaintiffs adopt Defendants' statement of jurisdiction except as follows: because Plaintiffs brought their actions pursuant to 42 U.S.C. § 1983, the district court had subject matter jurisdiction under 28 U.S.C. § 1331, which was in no way "limited."

## STATEMENT OF ISSUES

1.      Do Plaintiffs have standing to sue Governor Lee because he controls the state and local officials who enforce the Act via his statutory power and duty to initiate ouster proceedings against officials who knowingly or willfully commit misconduct or neglect of duty?

2.      Under *Ku v. State of Tennessee*, 322 F.3d 431 (6th Cir. 2003), have Defendants waived their sovereign immunity defense by failing to raise it until after litigating Plaintiffs' claims on the merits to final judgment?

3.      If Governor Lee has not waived his sovereign immunity defense, may Plaintiffs sue him under *Ex Parte Young*, 209 U.S. 123 (1908), because:

a.      He controls the state and local officials who enforce the Act via his statutory power and duty to initiate ouster proceedings against officials who knowingly or willfully commit misconduct or neglect of duty; or

b.      Under *Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656 (6th Cir. 1982) there is a substantial public interest in enforcing the Act?

4.      May Plaintiffs challenge the Act's punitive effect as a whole via their *Ex Parte Young* claim against Director Rausch, including those

provisions he does not directly enforce, because his role in administering the Act's regulatory scheme is essential to the enforcement of all of its provisions?

5. Did Defendants waive the issue of whether the Act applies retroactively to Plaintiffs by failing to claim otherwise in the district court?

6. If Defendants have not waived the issue of retroactivity, does the Act apply retroactively to Plaintiffs under *Miller v. Fla.*, 482 U.S. 423 (1987) because it changes the legal consequences of their pre-enactment offenses?

7. Did the district court correctly determine that the Act's regulatory scheme is punitive in effect as a whole under *Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016)?

8. Did the district court correctly determine that the Act was not subject to elision under Tennessee law and therefore enjoin enforcement of the entire Act?

9. Does the district court's injunction restrain Defendants in sufficiently specific and detailed terms?

2

10.    Did the district court correctly conclude the public interest in preventing violations of constitutional rights justified injunctive relief?

11.    Did the district court correctly conclude that declaratory relief would complement injunctive relief?

## STATEMENT OF THE CASE

### *The History of Tennessee's Sex Offender Registry Laws[1]*

On May 10, 1994, Governor Ned Ray McWherter signed into law Tennessee's Sexual Offender Registration and Monitoring Act ("SORMA"). 1994 Tenn. Pub. Laws, ch. 976. SORMA required TBI to "establish, maintain, and update a centralized record system of sexual offender registration and verification information." *Id.* § 7(a). "Sexual offender" was defined as an individual who had been convicted of one of a number of enumerated offenses under Tennessee criminal law—or who was convicted of committing the equivalent behavior in another state—unless the offender had been wholly released without supervision from incarceration, probation, or parole prior to January 1, 1995. *Id.* § 3(2)–(3). Accordingly, SORMA applied to some, but not all, qualifying offenders whose criminal acts occurred before the law's enactment.

---

[1] This subsection of Appellees' statement of the case quotes verbatim Chief Judge Crenshaw's summary of the Act's history in *Doe v. Haslam*, No. 3:16-CV-02862, 2017 WL 5187117, at *1–3 (M.D. Tenn. Nov. 9, 2017).

SORMA required any individual convicted of a sexual offense to register within ten days of release without supervision from probation, parole, or incarceration. *Id.* § 4. TBI was then instructed to send the registrant a verification and monitoring form every ninety days, which the registrant was required to complete and return within ten days of receipt. *Id.* § 5. In addition to these periodic updates, a registrant had an ongoing duty to complete a new form within ten days of any change of residence or entry into a municipality or county for temporary residence or domicile. *Id.* § 4. SORMA imposed no in-person registration or reporting duty, relying instead on the prescribed paper forms. *Id.* The information in the SORMA registry was expressly designated as confidential, with the exception that TBI or a local law enforcement agency could "release relevant information deemed necessary to protect the public concerning a specific sexual offender." *Id.* § 7(c). An offender registered under SORMA was permitted to petition a court for relief from its requirements ten years after his or her release from supervision. *Id.* § 8(a). The court, upon consideration of several factors including the age of the offender's victims and the behavior of the offender since his offense, was

required to grant the petition if it found the registrant had complied with the Act, was rehabilitated, and did not pose a threat to public safety. *Id.* § 8(c). If the petition was granted, the TBI was required to expunge the registrant's data from its registry. *Id.*

In the ensuing decade, the General Assembly repeatedly amended SORMA either to expand its scope, increase the reporting requirements placed on registered offenders, or reduce the level of confidentiality of registry information. See 1996 Tenn. Pub. Acts, ch. 834, § 1 (extending SORMA to individuals charged with sex offenses but placed on pre-trial and judicial diversion); 1997 Tenn. Pub. Acts, ch. 455, § 3 (extending SORMA to individuals who had completed diversion and had their records expunged); 1997 Tenn. Pub. Acts, ch. 461, § 2 (making public registry information for offenders whose offenses were committed after July 1, 1997); 1997 Tenn. Pub. Acts, ch. 466, § 1 (extending SORMA to individuals convicted of certain non-sexual offenses against minors and permitting TBI to require that registrants provide current photographs); 2000 Tenn. Pub. Acts, ch. 882, § 1 (imposing mandatory 180-day sentence for falsification of registration forms); 2000

6

Tenn. Pub. Acts, ch. 997, § 1–2 (imposing mandatory lifetime registration for offenders with multiple convictions for sexual offenses or a single conviction of a "violent sexual offense," defined as actual or attempted aggravated rape, rape, aggravated sexual battery, or rape of a child); 2000 Tenn. Pub. Acts, ch. 997, § 3 (requiring registered offender to report within ten days of coming to a municipality or county in which they work or are students); 2002 Tenn. Pub. Acts, ch. 469, §§ 3, 5, and 11 (requiring registered offenders to report within ten days of being employed or becoming a student or volunteer at an institution of higher learning in the county or municipality in which they reside, and providing that the name and address of that institution will be made public for registered offenders who committed offenses after October 27, 2002).

SORMA did not expressly restrict where a registrant could live, work, or travel until 2003. … In 2003, however, the General Assembly enacted legislation prohibiting a SORMA registered offender from: establishing a residence or accepting employment with 1,000 feet of a school, a child care facility, or the home of their victim or the victim's immediate family member;

coming within 100 feet of the victim; establishing a residence or other living accommodation with a minor who was not the registered offender's own child; and establishing a residence with the registered offender's own minor child, if any child of the offender had been the offender's victim or if the offender's parental rights had been or were being terminated. 2003 Tenn. Pub. Acts, ch. 95, § 1. A violation of any of the 2003 prohibitions was a Class A misdemeanor. *Id.*

In 2004, the Tennessee General Assembly repealed SORMA and replaced it with the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act ("Act"), which continues, in amended form, today. 2004 Tenn. Pub. Laws, ch. 921. The Act continued the State's registration system, albeit with some changes. Carrying on a distinction first introduced to SORMA in 2000, the Act classifies registrants as either "sexual offenders" or "violent sexual offenders," depending on the offense of which that registrant was convicted. Individuals classified as sexual offenders include those convicted of sexual battery, statutory rape, aggravated prostitution, sexual exploitation of a minor, incest, indecent exposure (upon

8

the third such conviction), and false imprisonment of a minor who was not

the offender's own child—an offense that, in and of itself, contains no ex-

pressly sexual element, see Tenn. Code Ann. § 39-13-302 ("A person commits

the offense of false imprisonment who knowingly removes or confines an-

other unlawfully so as to interfere substantially with the other's liberty.").

*Id.* § 1(16). Also included as sexual offenders are any offenders convicted of

attempt, solicitation, conspiracy, criminal responsibility, facilitation, or be-

ing an accessory after the fact with regard to any of the qualifying offenses.

*Id.* Individuals classified as violent sexual offenders include those convicted

of rape, aggravated rape, rape of a child, aggravated sexual battery, aggra-

vated or especially aggravated sexual exploitation of a minor, aggravated or

especially aggravated kidnapping of a minor other than the offender's own

child, sexual battery by an authority figure, solicitation of a minor, and at-

tempt, solicitation, or conspiracy with regard to any of the aforementioned

qualifying offenses. *Id.* § 1(24).

Under the Act, sexual offenders must verify their registration infor-

mation on an annual basis, and violent sexual offenders must do so

9

quarterly. Tenn. Code Ann. § 40-39-204(b)–(c). In contrast to SORMA's system of TBI-propagated forms, the Act requires offenders to register and report in person to a designated law enforcement agency. Tenn. Code Ann. §§ 40-39-203(a), 40-39-204(b). Reports based on certain triggering events, such as a change of residence or employment, must be made within forty-eight hours. Tenn. Code Ann. § 40-39-203(a)(3)–(6). The Act increased the amount of information required to be reported, Tenn. Code Ann. § 40-39-203(h), and offenders are required to pay administrative fees related to their ongoing inclusion in the registry, Tenn. Code Ann. § 40-39-204(b)(1) and (c). Some offenders remain eligible for removal from the registry after ten years, but the authority to make an initial removal decision has been vested in the TBI, with a right to appeal to a chancery court. Tenn. Code Ann. § 40-39-207(b), (g). A violation of the Act's requirements is now a felony, as opposed to a misdemeanor under SORMA. Tenn. Code Ann. § 40-39-208(b).

Like SORMA, the Act has been repeatedly revised to increase its restrictions and requirements and to make more information about registered offenders publicly available. See 2005 Tenn. Pub. Acts, ch. 316, § 1 (adding

10

to events and information that must be reported and increasing administrative fees); 2006 Tenn. Pub. Acts, ch. 890, § 20 (forbidding registrants whose victims were minors from living, obtaining sexual offender treatment, or working within 1,000 feet of a school, day care center, public park, playground, recreation center, or public athletic field available for use by the general public); 2007 Tenn. Pub. Acts, ch. 126, § 1 (adding to events triggering a 48-hour reporting obligation); 2007 Tenn. Pub. Acts, ch. 531, § 1 (making public all registrants' information, regardless of date of offense); 2008 Tenn. Pub. Acts, ch. 979, § 1 (adding information required to be reported and making information, including registrant e-mail addresses, available to qualifying businesses); 2008 Tenn. Pub. Acts, ch. 1164, § 13 (restricting employment permitted to registrants whose victims were minors and forbidding said registrants from wearing certain costumes—such as clowns or fictional characters—in the presence of minors); 2009 Tenn. Pub. Acts, ch. 597, § 1 (forbidding all registrants, regardless of age of victim, from the premises of school, day care center, public park, playground, recreation center, or public athletic field available for use by the general public if they have reason to believe

children are present, or from standing or sitting idly within 1,000 feet of such locations unless the registrant is responsible for a child or a "specific or legitimate reason" for their presence); 2010 Tenn. Pub. Acts, ch. 1138, §§ 7, 13 (increasing information required to be reported and requiring registrants to maintain and carry photo identification); 2010 Tenn. Pub. Acts, ch. 1145, § 1 (forbidding more than two registrants from living in the same residence); 2011 Tenn. Pub. Acts, ch. 266, § 1 (imposing reporting restrictions related to international travel); 2011 Tenn. Pub. Acts, ch. 287, § 1 (permitting public library directors to ban registrants from library premises); 2014 Tenn. Pub. Acts, ch. 992, § 1 (prohibiting registrants, regardless of age of victim, from living or working within 1,000 feet of a school, day care center, public park, playground, recreation center, or public athletic field available for use by the general public); 2014 Tenn. Pub. Acts, ch. 751, § 1 (authorizing local governments to establish community notification systems designed to notify residents, schools, and child care facilities when a registrant lives within a certain distance); 2014 Tenn. Pub. Acts, ch. 770, §§ 1, 2 (imposing lifetime registration requirement on all offenders whose victims were twelve or younger);

12

2015 Tenn. Pub. Acts, ch. 516, § 1 (increasing information required to be re-ported and prohibiting registrants being alone with a minor in a "private area").

### The Act[2]

### 1.    Initial Eligibility and Levels of Offender.

The current version of the Act dictates that individuals convicted of certain enumerated offenses must register with law enforcement for inclusion in a database maintained by the TBI. Offenses that require registration are mostly ones that, on their face, contain a sexual element, such as serial indecent exposure, aggravated rape, and rape of a child. Tenn. Code Ann. § 40-39-202(20)(A)(vii), (31)(A), (D).

The Act divides registrants into "sexual offenders" and "violent sexual offenders," based primarily on the particular offense of which the person was convicted. Most, but not all, of the crimes designated as violent sexual

---

[2] This subsection of Appellees' statement of the case quotes verbatim Judge Trauger's summary of the Act's obligations and restrictions in her memorandum opinion granting summary judgment in this case. *Does #1-9 v. Lee*, No. 3:21-CV-00590, 2023 WL 2335639, at *3–7 (M.D. Tenn. Mar. 2, 2023).

offenses include an element of actual violence. See Tenn. Code Ann. § 40-39-202(31). A (non-violent) sexual offender with no prior conviction for a sexual offense may petition to be removed from the registry after ten years, and his petition will be considered in light of a number of factors, including his history of compliance with the Act's restrictions. A violent sexual offender or a sexual offender with a prior conviction, however, will remain on the registry for the remainder of his life. Tenn. Code Ann. § 40-39-207(g)(2).

A registered offender's Tennessee-issued driver's license will identify him as a sexual offender or violent sexual offender, as applicable. Tenn. Code Ann. § 55-50-353. He is required to carry his driver's license or equivalent government-issued photo identification card whenever outside his home. Tenn. Code Ann. § 40-39-213.

**2.    Registration and Updating Information**

An offender registering for the first time must provide the following information, on penalty of perjury:

> (1)    Complete name and all aliases, including, but not limited to, any names that the offender may have had or currently has by reason of marriage or otherwise, including pseudonyms and ethnic or tribal names;

14

(2)    Date and place of birth;

(3)    Social security number;

(4)    A photocopy of a valid driver license, or if no valid driver license has been issued to the offender, a photocopy of any state or federal government issued identification card;

(5)    For an offender on supervised release, the name, address and telephone number of the registrant's probation or parole officer or other person responsible for the registrant's supervision;

(6)    Sexual offenses or violent sexual offenses for which the registrant has been convicted, the date of the offenses and the county and state of each conviction; or the violent juvenile sexual offense for which the registrant has been adjudicated delinquent, the date of the act for which the adjudication was made and the county and state of each adjudication;

(7)    Name of any current employers and length of employment, including physical addresses and phone numbers;

(8)    Current physical address and length of residence at that address, which shall include any primary or secondary residences ...;

(9)    Mailing address, if different from physical address;

(10)    Any vehicle, mobile home, trailer or manufactured home used or owned by an offender, including descriptions, vehicle information numbers and license tag numbers;

15

(11)    Any vessel, live-aboard vessel or houseboat used by an offender, including the name of the vessel, description and all identifying numbers;

(12)    Name and address of each institution of higher education in this state where the offender is employed or practices a vocation or is a student;

(13)    Race and gender;

(14)    Name, address and phone number of offender's closest living relative;

(15)    Whether victims of the offender's convictions are minors or adults, the number of victims and the correct age of the victim or victims and of the offender at the time of the offense or offenses, if the ages are known;

(16)    Verification by the TBI or the offender that the TBI has received the offender's DNA sample;

(17)    A complete listing of the offender's electronic mail address information, including usernames, any social media accounts the offender uses or intends to use, instant message, other internet communication platforms or devices, and the offender's username, screen name, or other method by which the offender accesses these accounts or websites;

(18)    Whether any minors reside in the primary or secondary residence;

(19)(A) Any other registration, verification and tracking information, including fingerprints and a current photograph of the offender, vehicles and vessels, as referred to in subdivisions (i)(10) and (i)(11), as may be required by rules promulgated by the TBI ...;

(20)    Copies of all passports and immigration documents; and

(21)    Professional licensing information that authorizes an offender to engage in an occupation or carry out a trade or business.

Tenn. Code Ann. § 40-39-203(i). The Act provides that much of this information, including the registrant's photograph, address and employer, "shall be considered public information" and must be made available to the public through a web page. Tenn. Code Ann. § 40-39-206(d).

The offender has an ongoing duty to keep the state's information up to date. "Within forty-eight (48) hours of establishing or changing a primary or secondary residence, establishing a physical presence at a particular location, becoming employed or practicing a vocation or becoming a student in this state, the offender shall register or report in person" with the appropriate law enforcement agency. Tenn. Code Ann. § 40-39-203(a)(1). A registrant also has 48 hours to report any "change in any other information given to the registering agency by the offender that is contained on the registration form" or any "material change in employment or vocation status." Tenn. Code Ann. § 40-39-203(a)(4), (6). The registrant has "three (3) days, excluding

holidays" to report any change in his "electronic mail address information, any instant message, chat or other internet communication name." Tenn. Code Ann. § 40-39-203(7).

If the registrant fails to provide any of the required updated information within the time periods required, he has committed a Class E felony. Tenn. Code Ann. § 40-39-208(b). The registrant's first such offense is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-208(c). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180) days." Tenn. Code Ann. § 40-39-208(d). Any subsequent violations are "punishable by a fine of not less than one thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year." Tenn. Code Ann. § 40-39-208(e).

### 3.  In-Person Reporting and Fees

The Act also requires periodic in-person reporting with the offender's designated law enforcement agency. Violent sexual offenders must "report

in person during the months of March, June, September, and December of each calendar year, to the designated law enforcement agency, on a date established by such agency, to update the offender's fingerprints, palm prints and photograph, as determined necessary by the agency, and to verify the continued accuracy of the information in the TBI registration form." Tenn. Code Ann. § 40-39-204(b)(1). Sexual offenders must report in person once a year. Tenn. Code Ann. § 40-39-204(c). At the sexual offender's check-in, or the violent sexual offender's first check-in, he is required to pay administrative fees not to exceed $150. Tenn. Code Ann. § 40-39-204(b)(1), (c). If the offender lives in a county or municipality that has adopted a "community notification system" to inform the public when a sexual offender moves in nearby, the offender may be liable for an additional $50 fee. Tenn. Code Ann. § 40-39-217(a)(2).

**4.    Restrictions on Where a Registrant Can Live or Work**

A registered offender may not

> knowingly establish a primary or secondary residence or any other living accommodation or knowingly accept employment within one thousand feet (1,000′) of the property line of any [1] public school, [2] private or parochial school, [3] licensed day

> care center, [4] other child care facility, [5] public park, [6] play-
> ground, [7] recreation center, or [8] public athletic field available
> for use by the general public.

Tenn. Code Ann. § 40-39-211(a)(1). There is an exception if the proximity ex-

ists solely because of the change in ownership of a property after the of-

fender established the residence or began the job. Tenn. Code Ann. § 40-39-

211(e). Violating this restriction is a Class E felony. Tenn. Code Ann. § 40-39-

211(f). The first violation is "punishable by a fine of not less than three hun-

dred fifty dollars ($350) and imprisonment for not less than ninety (90)

days." Tenn. Code Ann. § 40-39-211(g)(1). The second violation "is punisha-

ble by a fine of not less than six hundred dollars ($600) and imprisonment

for not less than one hundred eighty (180) days." Tenn. Code Ann. § 40-39-

211(g)(2). Any subsequent violations are "punishable by a fine of not less

than one thousand one hundred dollars ($1,100) and imprisonment for not

less than one (1) year." Tenn. Code Ann. § 40-39-211(g)(3).

### 5.    Restrictions on Registrant's Movements

A registered offender is forbidden from knowingly

> [b]e[ing] upon or remain[ing] on the premises of any building or
> grounds of any [1] public school, [2] private or parochial school,

20

[3] licensed day care center, [4] other child care facility, [5] public park, [6] playground, [7] recreation center or [8] public athletic field available for use by the general public in this state when the offender has reason to believe children under eighteen (18) years of age are present.

Tenn. Code Ann. § 40-39-211(d)(1). There are exceptions for certain expressly enumerated parenting-related activities, but those exceptions are only available if the offender has obtained "written permission or a request from the school's principal or the facility's administrator." Tenn. Code Ann. § 40-39-211(d)(2)(B). A separate provision allows a registered offender to pick up and drop off his child if he has provided the relevant administrator with written notice—meaning that, although the administrator can deny permission for most purposes, the administrator cannot prevent the offender from transporting his child to and from the school or facility, as long as the offender leaves immediately and does not otherwise come onto the premises. Tenn. Code Ann. § 40-39-211(d)(2)(D).

An offender is also forbidden from "[s]tand[ing], sit[ting] idly, whether or not the offender is in a vehicle, or remain[ing] within one thousand feet (1,000′) of the property line of any" of the aforementioned facilities

"when children under eighteen (18) years of age are present, while not having a reason or relationship involving custody of or responsibility for a child or any other specific or legitimate reason for being there." Tenn. Code Ann. § 40-39-211(d)(1)(B).

A violation of any of these restrictions is a Class E felony. Tenn. Code Ann. § 40-39-211(f). The first violation is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-211(g)(1). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180) days." Tenn. Code Ann. § 40-39-211(g)(2). Any subsequent violations are "punishable by a fine of not less than one thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year." Tenn. Code Ann. § 40-39-211(g)(3). A violation that is "due solely to a lack of the written permission required," however, is punishable only by fine. Tenn. Code Ann. § 40-39-211(g)(4).

**6.     Additional Restrictions Related to Children**

A registered offender may not "be alone with a minor or minors in a private area," defined generally as "any real or personal property, regardless of ownership, where the conduct of the offender is not readily observable by anyone but the minor or minors alone with the offender." Tenn. Code Ann. § 40-39-211(k)(1)(B), (2). Exceptions exist for the offender's own child, if certain criteria are met. Tenn. Code Ann. § 40-39-211(c), (k)(2). A violation is a Class E felony. Tenn. Code Ann. § 40-39-211(f). The first violation is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-211(g)(1). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180) days." Tenn. Code Ann. § 40-39-211(g)(2). Any subsequent violations are "punishable by a fine of not less than one thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year." Tenn. Code Ann. § 40-39-211(g)(3).

### *The Plaintiffs*

Plaintiffs are eight[3] men who must comply with the Act for life based on offenses committed before the January 1, 1995, effective date of Tennessee's original sex offender registry law. Defendants' Response to Plaintiffs' Statement of Material Facts, R. 128 at Page ID # 2655. Defendants label Plaintiffs "the Offenders," but Plaintiffs have not reoffended and have led law-abiding lives, working, marrying, raising children, and starting businesses. *See* Plaintiffs' Declarations in Support of Motion for Preliminary Injunction, R. 37-1, 37-2, 37-4, 37-5, 37-6, 37-7, R. 37-8, R. 47-1.

Plaintiffs sued Governor William Lee and Director David Rausch of the Tennessee Bureau of Investigation Director pursuant to 42 U.S.C. § 1983 claiming that the Act as applied to them violates the Ex Post Facto Clause. The district court granted preliminary injunctive relief to all but Doe #9, who did not yet live in Tennessee. *See* Memorandum & Preliminary Injunction, R. 76. The parties filed summary judgment motions, for purposes of which Defendants admitted they had "no evidence showing that the Act generally

---

[3] Plaintiff Doe #3 died on January 26, 2023. Suggestion of Death, R. 141.

reduces the incidence of criminal offenses, other than statements of law enforcement…," "no empirical evidence showing that the Act provides any other societal benefits, other than statements of law enforcement…," "no evidence showing that the legislature considered any evidence in enacting any aspect of the Act," "no evidence showing that failure to enforce the Act against Plaintiffs will increase the likelihood of Plaintiffs committing future criminal offenses, other than the declarations of [two law enforcement officials]," and "no justification for administering the Act other than its text." Defendants' Response to Plaintiffs' Statement of Material Facts, R. 128 at Page ID #2657–2659.

Relying on this Court's decision in *Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016), the district court held the Act violates the Ex Post Facto Clause as applied to Plaintiffs and granted a permanent injunction and declaratory relief. Order Granting Plaintiffs' Motion for Summary Judgment, R. 135. Defendants timely appealed that judgment.

## SUMMARY OF THE ARGUMENT

This Court has subject matter jurisdiction over Governor Lee. Plaintiffs have Article III standing to sue him because he has the power to control Director Rausch and other officials who enforce the Act via his statutory duty to bring ouster proceedings against them if they knowingly or willfully commit misconduct or neglect their duties. Defendants waived their sovereign immunity defense under *Ku v. State of Tennessee*, 322 F.3d 431 (6th Cir. 2003) by not raising it until after litigating the merits to final judgment. Even if Governor Lee has not waived sovereign immunity, he is a proper defendant under *Ex Parte Young*, 209 U.S. 123 (1908), based on his control over Director Rausch and other officials who enforce the Act, as well as *Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656 (6th Cir. 1982), based on the substantial public interest in enforcing the Act.

The district court's subject matter jurisdiction over Director Rausch is not limited to the parts of the Act he directly administers under *Doe v. Dewine*, 910 F.3d 842 (6th Cir. 2018) because he is statewide official actively involved in administering the statute.

Defendants waived their claim that the Act is not retroactive by conceding it was below. Furthermore, the Act is retroactive under *Miller v. Fla.,* 482 U.S. 423 (1987) because it changes the legal consequences of Plaintiffs' pre-enactment offenses.

The Ex Post Facto Clause requires examining a regulatory scheme as a whole to determine whether it is punitive in effect. The Act creates a single regulatory scheme, thus the district court properly examined it as a whole.

*Cutshall v. Sundquist*, 193 F.3d 466 (6th Cir. 1999) and *Doe v. Bredesen*, 507 F.3d 998 (6th Cir. 2007) are not controlling precedents because they considered materially different statutory schemes than the current Act and did not consider the cumulative punitive effect of the regulatory scheme as in *Snyder*. *Snyder* is controlling precedent and under *Snyder*, the Act's scheme is punitive in effect.

The district court's injunctive relief is proper. First, the district court correctly enjoined enforcement of the entire Act because it correctly held the Act was not subject to elision. Second, the text of the injunction is clear and Defendants' compliance with it demonstrates their understanding of it.

Third, the district court correctly weighed the public interest in preventing violations of constitutional rights.

Finally, district court correctly determined that declaratory relief complemented and reinforced injunctive relief by giving notice of the Act's unconstitutionality to all law enforcement agents who enforce the Act in active concert or participation with Defendants.

## ARGUMENT

In *Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016), this Court held Michigan's sex offender registry scheme was punitive in effect because its restrictions and requirements resembled the traditional punishments of banishment, public shaming, parole, and probation; imposed affirmative disabilities and restraints on offenders; promoted the punitive goals of incapacitation, deterrence, and retribution; and imposed burdens excessive to its non-punitive purpose of preventing future acts of sexual violence. The district court correctly held that the sex offender registry scheme created by the Act is similar to the Michigan scheme in all material respects and therefore punitive in effect to at least the same extent.

Defendants cannot distinguish *Snyder* on the facts, so they try to avoid its binding force through various means. They challenge the district court's subject matter jurisdiction over Governor Lee and over Director Rausch to a lesser extent, despite making no such claims below. They claim the Act is not retroactive based on a footnote of *dicta* in a Supreme Court opinion construing an immigration statute—another issue they never raised below. They

claim the district court should have followed earlier precedents that considered earlier versions of Tennessee's sex offender registry scheme. And they claim the district court enjoined too much of the Act, that it should have devised a way to preserve at least some of it, and that it should not have declared the Act unenforceable against Plaintiffs. For the reasons that follow, these arguments fail to blunt *Snyder*'s legal force. The district court correctly applied *Snyder* and should be affirmed in all respects.

## I.   Defendants are proper parties.

### A.   Plaintiffs have standing to sue Governor Lee.

Defendants claim Plaintiffs lack standing to sue Governor Lee because "no constitutional violation is traceable" to him. Brief at 21. Defendants claim no constitutional violation is traceable to Governor Lee because "he has no authority to enforce Tennessee's sex offender regulations" and "the regulatory duties imposed on Director Rausch do not trace to Governor Lee, because the governor lacks the ability to control the TBI Director through at-will removal." Brief at 20–21. Defendants are mistaken.

Governor Lee does not merely have a general duty to uphold the law. State law expressly requires him to initiate ouster proceedings against any state or local official who "knowingly or willfully" commits "misconduct in office" or "neglect[s] to perform any duty enjoined upon such officer by any of the laws of the state[.]" Tenn. Code Ann. § 8-47-101, § 8-47-109. Thus, Governor Lee has the power to compel state or local officials to enforce the Act.

He also has the power to compel them not to enforce it to the extent unconstitutional. All state and local elected or appointed officials and their deputies take a constitutional oath "to support the Constitution…of the United States[.]" Tenn. Const. Art. X, Sec. 1. Were an official to knowingly enforce the Act in violation of the Ex Post Facto Clause, that would constitute "misconduct" and "neglect to perform [a] duty enjoined" upon him and require the Governor to initiate ouster proceedings.

Because the Governor **can** control Director Rausch, his regulatory duties **do** trace to Governor Lee, and the constitutional violation Plaintiffs claim **is** traceable to him. Plaintiffs therefore have standing to sue Governor Lee.

31

**B.**    **Governor Lee is a proper defendant under *Ex Parte Young*.**

**1.**    **Defendants have waived sovereign immunity by litigating this case to final judgment on the merits without raising sovereign immunity.**

Governor Lee and Director Rausch have waived any sovereign immunity claim by litigating this case to final judgment on the merits without raising the issue. *See Ku v. State of Tennessee*, 322 F.3d 431, 435 (6th Cir. 2003); *see also Lawson v. Shelby Cnty., TN*, 211 F.3d 331, 334 (6th Cir. 2000) ("Consent may also take the form of a voluntary appearance and defense on the merits in federal court.")

In *Ku,* the state had appeared without objection, defended on the merits, engaged in "substantial discovery," filed a motion for summary judgment," and did not raise sovereign immunity until losing that motion. 322 F.3d at 432. This Court held that "appearing without objection and defending on the merits in a case over which the district court otherwise has original jurisdiction is a form of voluntary invocation of the federal court's jurisdiction that is sufficient to a waive a State's defense of Eleventh Amendment immunity." *Id.* at 435. This Court held the state's conduct amounted to

having "its fingers crossed behind its metaphorical back the whole time" and created "the same kind of inconsistency and unfairness" the Supreme Court had found to result in waiver in other circumstances. *Id.*

Defendants claim that *Ku* must be overruled as inconsistent with *Edelman v. Jordan*, 415 U.S. 651 (1974). This is not solid ground for overruling a binding circuit precedent. Defendants rely on *Edelman*'s statement that sovereign immunity "sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court," but that statement is *dicta* that is inconsistent with other Supreme Court authorities holding that sovereign immunity is a waivable defense. *See Hill v. Blind Indus. & Servs. of Maryland*, 179 F.3d 754, 760–63 (9th Cir.), *opinion amended on denial of reh'g*, 201 F.3d 1186 (9th Cir. 1999) (summarizing Supreme Court case law on waiver of sovereign immunity).

*Ku* therefore remains good law and binding circuit precedent. *See, e.g., Barachkov v. Davis*, 580 F. App'x 288, 299 (6th Cir. 2014) ("Waiver is a case-specific inquiry, focused on the course of a state's litigation conduct. For example, this court has held that where a state loses its case on the merits after

extensive discovery, a state may not then claim sovereign immunity."); *Boler v. Earley*, 865 F.3d 391, 410 (6th Cir. 2017) ("In *Ku v. Tennessee*, 322 F.3d 431, 435 (6th Cir. 2003), we determined that by engaging in substantial discovery, filing a motion for summary judgment, and only raising an Eleventh Amendment defense after an adverse ruling on the summary judgment motion, the State of Tennessee had voluntarily invoked jurisdiction sufficient to waive its sovereign immunity defense."). Under *Ku,* Defendants waived sovereign immunity by defending this case on the merits, participating in discovery, filing a motion for summary judgment based entirely on the merits of Plaintiffs' claims, *see* Memorandum in Support of Defendant's Motion for Summary Judgment, R. 116, and only raising sovereign immunity after they lost.

> ## 2.  Regardless of waiver, Governor Lee is a proper defendant under *Ex Parte Young*.

The Court does not, however, have to resolve this waiver issue because Governor Lee is a proper defendant under *Ex Parte Young,* 209 U.S. 123 (1908). To pursue an *Ex Parte Young* claim against a state official, the official must "have some connection with the enforcement" of the law in question.

34

*Id.* at 157. While "[g]eneral authority to enforce the laws" is not enough, *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048 (6th Cir. 2015) (cleaned up), Governor Lee has more than that. His statutory duty to remove state and local officials for knowing or willful misconduct and neglect of duty gives him the power to compel those officials to enforce the Act or not to enforce the Act to the extent unconstitutional. *See* Section I(A) above. That power is more than "general authority to enforce the laws" and makes Governor Lee a proper defendant under *Ex Parte Young.*

Additionally, Governor Lee is a proper *Ex Parte Young* defendant under *Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656, 665 & n.5 (6th Cir. 1982), which held an *Ex Parte Young* action may properly be brought against a governor to challenge an unconstitutional law, "[e]ven in the absence of specific state enforcement provisions," if "the substantial public interest in enforcing [the unconstitutional law] places a significant obligation upon the Governor to use his general authority to see that state laws are enforced." *Id.* at 665 & n.5. Defendants concede that the Act is of substantial public interest, *see* Brief at 56–57. Thus, under *Allied*, Governor Lee is a proper defendant.

35

Defendants ask the Court to overrule *Allied* as inconsistent with *Whole Women's Health v. Jackson*, 142 S. Ct. 522 (2021). But *Whole Women's Health* is **not** directly on point because it involved an unusual statutory scheme **designed** to prevent **any** section 1983 claims challenging its constitutionality. *See id.* at 530. In contrast, the Act is enforced only by public officials, and Governor Lee has the power to compel how those officials enforce it. *Whole Women's Health* is no basis for overruling *Allied.*

## C.   The district court's jurisdiction over Director Rausch was not limited because his enforcement authority is extensive and integral to the operation of the Act's regulatory scheme.

Defendants concede Director Rausch is a proper defendant but claim the district court exceeded its jurisdiction under *Ex Parte Young* by reviewing "laws *not* enforced through Director Rausch's office." Brief at 29. In other words, Defendants claim that under *Ex Parte Young,* one may only challenge the constitutionality of the specific provisions of a statutory scheme directly controlled by the defendant official. *Id.* Director Rausch has waived this claim, *see* Section I(B)(1) above, and it contradicts binding precedent.

This claim stems from Defendants' mistaken belief that the district court should have determined the punitive effect of each provision of the Act separately, rather than examining the cumulative punitive effect of the Act's scheme as a whole. As Plaintiffs explain in Section III(B) below, the Act is not a collection of "laws" enforced by various people but a comprehensive regulatory scheme whose punitive effect must be determined as a whole. The portions of that scheme directly controlled by the TBI are the heart of that scheme: Director Rausch's agency decides how to classify registrants ("sexual offender," "violent sexual offender," and/or "offender against children"), collects their information, publishes much of it to the world, makes all of it available to law enforcement agencies, and reports noncompliant registrants to other law enforcement agencies to trigger their arrest and prosecution. *See* Section III(B) below.

Defendants' citation to *Whole Woman's Health*, 142 S. Ct. 522, 535–536 & n.3, does not support their claim because it dealt with a scheme designed to deprive **any** officials of enforcement authority. *Id.* at 530. In contrast, the Act places Director Rausch at the heart of its scheme. Defendants' citation of

37

*Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1415–1416 (6th Cir. 1996) is even less illuminating because it held *Ex Parte Young* did not apply because the plaintiff was suing the official for **not** enforcing a statute. *Id.* at 1416.

In contrast, Defendants' claim contradicts *Doe v. Dewine*, 910 F.3d 842 (6th Cir. 2018). The plaintiff in that case claimed a sex offender registry law violated her due process rights by classifying her as a "sexual predator" without a hearing. *Id.* at 846. She sued the attorney general, the superintendent of the Ohio Bureau of Criminal Investigation, and a sheriff. *Id.* at 847. The attorney general and superintendent claimed they were not proper defendants under *Ex Parte Young* because they had no authority to enforce the law against her or grant her a hearing. *Id.* at 848, 850. *Dewine* rejected both arguments, holding that "enjoining a statewide official under *Young* is appropriate when there is a realistic possibility the official will take legal or administrative actions against the plaintiff's interests." *Id.* at 848–849 (cleaned up). While those defendants could not grant the plaintiff a hearing, the district court could, "**in addition to striking the laws as**

**unconstitutional**,…order Defendants to remove Doe's information form the state-wide registry…and relieve her from any registration requirements until…a…hearing becomes available." *Id.* at 851 (emphasis added). Thus, the statewide defendants were proper defendants for purposes of challenging the constitutionality of a law because enjoining them would grant her **some** relief.

Under *Dewine*, Director Rausch is a proper defendant for Plaintiffs' challenge to the Act as a whole because there "is a realistic possibility" he "will take legal or administrative actions against the plaintiff's interests" and enjoining him will grant Plaintiffs at least some relief.

## II.    The Act applies retroactively to Plaintiffs.

### A.    Defendants waived any claim that the Act is not retroactive by conceding retroactivity below.

Defendants claim the Act is not retroactive but instead "a prospective regulation of dangers that arise post enactment." Brief at 39. However, Plaintiffs' motion for summary judgment claimed the Act was an *ex post facto* law because it "applies to Plaintiffs solely based on offenses that occurred before the Act's effective date or the effective date of Tennessee's first sex offender

registry law." R. 121 at Page ID #2560. Defendants' response in opposition to Plaintiffs' summary judgment motion did not challenge Plaintiffs' claim that the Act was retroactive. *See* R. 127. Nor did Defendants challenge Plaintiffs' claim in their own motion for summary judgment, R. 115, supporting memorandum, R. 116, or reply, R. 129.

The district court correctly interpreted Defendants' silence as a concession that the Act was retroactive as applied to Plaintiffs and only addressed the remaining question of whether the Act was punitive in effect. *See Does #1-9*, 2023 WL 2335639, at *10 ("The parties agree that the government may not retroactively increase the punishment for criminal acts…The parties disagree, however, with regard to whether or not the set of obligations, liabilities, and restrictions arising out of the Act qualifies as a punishment.") (cleaned up). Defendants have therefore waived this issue. *Puskas v. Delaware Cnty., Ohio*, 56 F.4th 1088, 1098 (6th Cir. 2023) ("[Plaintiff] did not make that argument in the district court at summary judgment (and she could have). So, we do not consider it on appeal.") (cleaned up).

**B.**    *Weaver* **and** *Miller* **govern the standard for retroactivity.**

Even if Defendants had not waived retroactivity, their claim contradicts binding precedent. The standard for determining retroactivity is found in *Weaver v. Graham*, 450 U.S. 24 (1981), and *Miller v. Florida*, 482 U.S. 423 (1987). *Weaver* held that to determine whether a law is retroactive, the "critical question is whether the law changes the legal consequences of acts completed before its effective date." 450 U.S. 24, 31 (1981). *Miller* reaffirmed *Weaver*, holding, "A law is retrospective if it changes the legal consequences of acts completed before its effective date." 482 U.S. 423, 430 (1987) (quoting *Weaver*, 450 U.S. at 31) (cleaned up).

This Court uses the *Weaver/Miller* standard to determine retroactivity under the Ex Post Facto Clause. *Cutshall v. Sundquist*, 193 F.3d 466, 476 (6th Cir. 1999) ("The parties do not dispute that the Act was passed after Cutshall committed his sexual offense. They also agree that the Act purports to apply to those convicted of sex offenses prior to its enactment. Therefore, we need only address the second element of the ex post facto analysis."); *Doe v. Bredesen*, 507 F.3d 998, 1003 (6th Cir. 2007) (referring to "ex post facto

41

challenges to state statutes that retroactively require sex offenders convicted before their effective date to comply with similar registration, surveillance, or reporting requirements").

### C.    *Vartelas* **did not overrule the** *Weaver/Miller* **standard.**

Defendants claim *Weaver* and *Miller* are not controlling authority because a footnote in *Vartelas v. Holder*, 566 U.S. 257 (2012) states "laws prohibiting persons convicted of a sex crime against a victim under 16 years of age from working in jobs involving frequent contact with minors…do not operate retroactively…[because] they address dangers that arise postenactment: sex offenders with a history of child molestation working in close proximity to children[.]" *Id.* at 271 n.7; Brief at 39, 46. Defendants claim *Vartelas'* footnote 7 replaced the *Weaver/Miller* standard and that under *Vartelas,* sex offender registry laws are not retroactive because "they address dangers that arise postenactment." *See* Brief at 39, 46. Defendants are mistaken. *Vartelas'* footnote 7 is *dicta,* its actual holding is consistent with *Weaver* and *Miller*, and it did not claim to overrule *Weaver* or *Miller*. Thus, *Weaver* and *Miller* control whether the Act is retroactive.

### 1. *Vartelas'* **footnote 7 is** *dicta.*

As the Seventh Circuit recognized in *Koch v. Vill. of Hartland*, 43 F.4th 747 (7th Cir. 2022), the **holding** in *Vartelas* is fully consistent with *Weaver/Miller*, while its footnote 7 is mere *dicta*. *Id.* at 753 n.3. The issue in *Vartelas* was whether Congress intended for an immigration law—which made it harder for permanent residents with criminal convictions to reenter the country—to apply retroactively to offenses that occurred before the law's enactment. *Vartelas*, 566 U.S. at 265–266. The Supreme Court applied a canon of statutory construction, the presumption against retroactive legislation, "under which courts read laws as prospective in application unless Congress has unambiguously instructed retroactivity." *Id.* at 266.

Under the presumption against retroactivity, a statute does not apply to circumstances where it would have "retroactive effect." *Id.* at 257. Applying a statute would have retroactive effect if it "would take away or impair vested rights acquired under existing laws, **or create a new obligation, impose a new duty, or attach a new disability, in respect to transactions or considerations already past**." *Id.* at 266 (emphasis added). The "essential

inquiry…is whether the new provision attaches **new legal consequences to events completed before its enactment**." *Id.* at 273 (cleaned up; emphasis added). Applying that standard, the Supreme Court held the immigration statute was non-retroactive because it would otherwise "attach a new disability to conduct over and done well before the provision's enactment." *Id.* at 267.

The dissent claimed the majority's retroactivity standard would apply to "laws prohibiting persons convicted of a sex crime against a victim under 16 years of age from working in jobs involving frequent contact with minors, and laws prohibiting a person who has been adjudicated as a mental defective or who has been committed to a mental institution from possessing guns." *Id.* at 271 n.7 (cleaned up). In footnote 7, the majority responded to that claim as follows: "The dissent is correct that these statutes do not operate retroactively. Rather, they address dangers that arise postenactment: sex offenders with a history of child molestation working in close proximity to children, and mentally unstable persons purchasing guns." *Id.*

As the Seventh Circuit recognized in *Koch*, this footnote is *dicta* and did not replace the *Weaver/Miller* standard. Rather, as the Seventh Circuit observed, *Vartelas'* holding is fully consistent with *Weaver/Miller*. *Koch*, 43 F.4th at 752–753. Based on *Weaver/Miller*, the majority opinion in *Koch* expressly overruled two circuit precedents that had held sex offender registry laws "were not retrospective because the law merely created new, prospective legal obligations based on the person's prior history." *Id.* at 752–755 (cleaned up).

The concurring opinion disagreed, claiming that *Weaver* was obsolete and that *Vartelas'* footnote 7 set a new standard: whether "the law's expressed reason for the new disability imposed on regulated individuals…is to target present wrongful activity, *i.e.*, postenactment dangers[.]" *Id.* at 758 (Kirsch, J. concurring in the judgment). The majority rejected that argument: "Proclamations about unrelated laws, including footnote seven, were *dicta*. Only a single provision of [the immigration law] was before the Court— opining about different statutes was not germane to the question presented." *Id.* at 753 n.3.

45

## 2.   *Vartelas' dicta* **did not overrule** *Weaver* **or** *Miller.*

While lower courts "are obligated to follow Supreme Court *dicta*, particularly where there is not substantial reason for disregarding it, such as age or subsequent statements undermining its rationale," *Am. C.L. Union of Kentucky v. McCreary Cnty., Ky.*, 607 F.3d 439, 447 (6th Cir. 2010), here there are four substantial reasons for disregarding *Vartelas'* dicta.

First, *Vartelas* does not purport to overrule *Weaver* or *Miller,* does not even mention them, and is a statutory construction case. Second, the Supreme Court "has also implicitly acknowledged, in *Smith v. Doe*, [538 U.S. 84 (2003),] that sex-offender laws applying to people with convictions before the effective date are retroactive," and "never considered the possibility that the law was only prospective, noting even the components of the system were 'retroactive.'" *Koch,* 43 F.4th at 753 (citing *Smith*, 538 U.S. at 90) (cleaned up). Third, this Court "may not disregard Supreme Court precedent unless and until it has been overruled by the Court itself" and that even "where intervening Supreme Court decisions have undermined the reasoning of an earlier decision, we must continue to follow the earlier case if it directly

46

controls until the Court has overruled it." *Taylor v. Buchanan*, 4 F.4th 406, 408

(6th Cir. 2021). Fourth, this Court continues to apply the *Weaver/Miller* stand-

ard. *See United States v. Kruger,* 838 F.3d 786, 790 (6th Cir. 2016) ("[F]or a

criminal or penal law to be *ex post facto*: it must be retrospective, that is, it

must apply to events occurring before its enactment[.]"[4]

> ### D.  The Act is retroactive because it changes the legal conse-
> quences of Plaintiffs' pre-enactment offenses.

Under *Weaver* and *Miller*, the Act is retroactive because Plaintiffs' obli-

gations under the Act are direct "legal consequences of acts completed be-

fore its effective date." *Miller,* 450 U.S. at 31; *Weaver,* 482 U.S. at 430. The only

remaining question is whether those obligations are punitive in effect.

### III.  The district court properly examined the Act as a whole to determine whether it was punitive in effect.

Defendants claim the district court erred by examining the Act as a

whole rather than examining the individual sessions laws that created and

---

[4] Defendants cite *Bremer v. Johnson*, 834 F.3d 925, 932 (8th Cir. 2016), and *United States v. Elk Shoulder*, 738 F.3d 948, 958 (9th Cir. 2013), Brief at 39, 44, 46, but their citations to *Vartelas' dicta* "were cursory, and later cases in both respective circuits turned back to *Weaver* when analyzing retroactivity under the Ex Post Facto Clauses." *Koch*, 43 F.4th at 754.

amended it. Brief at 34.[5] Defendants are mistaken. Under Supreme Court precedent, the punitive element of an *ex post facto* claim is determined by examining the regulatory "scheme" as a whole. The Act, as amended and codified, creates a single regulatory scheme. Thus, the district court properly examined the Act as a whole to determine whether it is punitive in effect.

### A.    To determine whether a law is punitive in effect, a court must examine the regulatory scheme as a whole.

Numerous Supreme Court cases instruct courts to consider the regulatory scheme as a whole. Where a statute retroactively altered the jury's sentencing role, a court "must compare the two statutory procedures *in toto* to determine if the new may be fairly characterized as more onerous." *Dobbert v. Florida.*, 432 U.S. 282, 294 (1977). Where a revised sentencing guideline appeared to disadvantage the plaintiff, the Supreme Court considered "the

---

[5] Relatedly, Defendants claim the Act as codified is not law because the "Tennessee Code is not a bill that passed into law." Brief at 32–33 But it is. The Tennessee Code was originally enacted by a session law and every year the legislature passes a "code bill" adding new session laws to the Code. *See Keaton v. State*, 372 S.W.2d 163, 164 (Tenn. 1963) (describing enactment of original code and annual codification and re-enactment process); *Doughty v. Hammond*, 341 S.W.2d 713, 717–718 (1960) ("The adoption of a code is a legislative act and not a mere revision of existing statutes….").

48

revised guidelines law **as a whole**" to see if it changed the result." *Miller v. Florida*, 482 U.S. 423, 431–432 (1987). *Seling v. Young*, 531 U.S. 250, 262 (2001), holds that *ex post facto* analysis resolves "whether a particular **scheme** is punitive." 531 U.S. at 263 (emphasis added).

In *Smith*, the Supreme Court held it must "examine whether the **statutory scheme** is so punitive either in purpose or effect as to negate the State's intention to deem it civil." 538 U.S. at 92 (cleaned up; emphasis added). The Supreme Court further held that the *Mendoza-Martinez* factors must be applied to the entire scheme: "The factors most relevant to our analysis are whether, in its necessary operation, the **regulatory scheme**: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Id.* at 97 (emphasis added).

Courts of Appeals follow this approach. In *Berrios v. United States*, 126 F.3d 430 (2d Cir. 1997), the Second Circuit held, "The relevant inquiry for *ex post facto* analysis is not whether a particular amendment to the Sentencing

Guidelines is detrimental to a defendant, but whether application of the later version of the Sentencing Guidelines, **considered as a whole**, results in a more onerous penalty." *Id.* at 433 (emphasis added). In *Himes v. Thompson*, 336 F.3d 848, 855 (9th Cir. 2003), the Ninth Circuit held that the "Ex Post Facto Clause is violated if a change in law creates a sufficient risk of increasing the measure of punishment attached to the covered crimes," which "risk is apparent from the face of the changed regulations if, **after comparing the two regulatory schemes as a whole**, it is apparent that the new regulations are detrimental." *Id.* at 855. *See Henderson v. Scott*, 260 F.3d 1213, 1216 (10th Cir. 2001) (statute did not violate Ex Post Facto Clause when "viewed within the whole context of Oklahoma's parole regulations").

### B.   The Act creates a single regulatory scheme.

Defendants' claims that "the typical *ex post facto* analysis addresses specific provisions of specific session laws," and that the Act's "various provisions come from separate legislative acts," Brief at 33, miss the point: however many times the Act has been amended, it creates a single regulatory scheme.

The district court aptly described the Act's comprehensive regulatory scheme as "a far-reaching structure for regulating the conduct and lifestyles of registered sexual offenders…for the rest of their lives." *Does #1-9*, 2023 WL 2335639, at *3. That scheme comprehensively monitors and restricts registrants by classifying them by offense, forcing them to register and report in person, collecting and publishing their information, tracking their compliance, restricting where they live, work, or are present, restricting their interactions with children, and coercing compliance with the threat of severe criminal punishment. Tenn. Code Ann. §§ 40-39-202–204, -206, -208, & -211. The district court correctly examined this scheme as a whole to determine whether it is punitive in effect.

## IV.    The district court correctly held that the Act's regulatory scheme is punitive in effect as a whole under *Snyder.*

For purposes of this litigation, Plaintiffs have assumed the Act is civil in intent, but contended the Act was punitive in effect based on the *Mendoza-Martinez* factors as applied by this Court in *Snyder.* The district court held that *Snyder* was directly on point: "What the plaintiffs have presented is a case that, in every meaningful way, falls squarely within the analysis of

51

*Snyder*…. While some laws might nevertheless present a close enough call that the minute details nevertheless end up mattering a good deal, that is not the case here. *Snyder* overwhelmingly supports a holding that the Act is punitive for *Ex Post Facto* Clause purposes…." *Does #1-9*, 2023 WL 2335639, at *17.

### A.    *Snyder*'s analysis of punitive effect is controlling precedent.

Defendants claim *Snyder* is not binding because two earlier cases, *Cutshall v. Sundquist*, 193 F.3d. 466 (6th Cir. 1999), and *Doe v. Bredesen*, 507 F.3d 998 (6th Cir. 2007), upheld the Act's registration, reporting, and publication provisions. *See* Brief at 38–44. Defendants are mistaken. Courts must examine the regulatory "scheme" as whole. *See* Section III(A). A precedent that examined a different scheme has less value than one that examines a similar scheme. Plus, under *Snyder*, a court should consider the "the cumulative effect of all of the Act's interlocking requirements and examine those requirements in the context of any historical antecedents," *Doe v. Haslam*, No. 3:16-CV-02862, 2017 WL 5187117, at *19–20 (M.D. Tenn. Nov. 9, 2017). Precedents

that review individual provisions provide little guidance to courts considering multiple provisions as a whole.

The Act did not exist when *Cutshall* was decided, and the 1994 scheme *Cutshall* examined lacked the features *Snyder* found resembled punishment: **in-person** registration or reporting, geographical restrictions, lifetime registration, and a public classification scheme "corresponding to the state's estimation of present dangerousness without providing for any individualized assessment." *Snyder*, 834 F.3d at 702–703; *see Cutshall,* 193 F.3d at 470–471, 474–475 (summarizing 1994 law's provisions).

*Bredesen* only examined the original form of the Act, but "Tennessee's scheme has been amended in meaningful respects" since *Bredesen* was decided "to increase its restrictions and requirements and to make more information about registered offenders publicly available." *Doe v. Haslam*, 2017 WL 5187117, at *3, *19 (M.D. Tenn. Nov. 9, 2017). Nor did *Bredesen* consider whether its geographic restrictions resemble banishment, 507 F.3d at 1002 n. 4, or whether its classification scheme resembled punishment. Nor did

*Bredesen* consider whether the Act's provisions might cumulatively be punitive in effect.

Given the material differences between the Act and the schemes in *Cutshall* and *Bredesen,* their non-cumulative analysis, and the district court's obligation to examine the Act's scheme as a whole, *see* Section III(A) above, the district court correctly held that *Snyder* was binding.

### B.    The Act resembles the traditional punishments of banishment, public shaming, parole, and probation.

The first *Mendoza-Martinez* factors are whether the statutory scheme "has been regarded in our history and traditions as a punishment" and whether it "imposes an affirmative disability or restraint[.]" *Smith*, 538 U.S. at 97. *Snyder* held the Michigan law met "the general, and widely accepted, definition of punishment offered by legal philosopher H.L.A. Hart: (1) it involves pain or other consequences typically considered unpleasant; (2) it follows from an offense against legal rules; (3) it applies to the actual (or supposed) offender; (4) it is intentionally administered by people other than the offender; and (5) it is imposed and administered by an authority constituted by a legal system against which the offense was committed." 834 F.3d at 701.

The Act meets the same definition because it imposes restrictions and obligations substantially similar to the those of the Michigan law.

### 1.  The Act's geographical restrictions resemble banishment.

*Snyder* held the Michigan law "resembles, in some respects at least, the ancient punishment of banishment" because its prohibitions against living, working, or "loitering" within 1,000 feet of a school were "very burdensome, especially in densely populated areas." 834 F.3d. at 702.

Defendants claim that "*Snyder*'s observation that Michigan's restrictions resembled banishment in some respects is neither dispositive nor particularly enlightening," Brief at 48 (cleaned up), but they admit there is no binding circuit authority holding that the Act's geographic restrictions are non-punitive, Brief at 46. So, while Defendants may not find it "enlightening," *Snyder* is dispositive as to the Act's geographic restrictions, and Defendants' citations to non-circuit cases are futile.[6]

---

[6] Those non-circuit cases are also distinguishable. Two do not deal with analogous geographic restrictions or analogous facts. *See Doe v. City of Lafayette, Ind.*, 377 F.3d 757 (7th Cir. 2004) (examining city's decision to ban repeat child molester from city parks after he told his probation officer he was

The district court therefore correctly applied *Snyder* and held that the Act's geographical restrictions resemble banishment: "*Snyder's* comparison to the traditional punishment of exile also holds true in Tennessee. The geographic and demographic patterns of Michigan and Tennessee are, of course, not identical. The defendants, however, have not identified anything that might even possibly be so different between the states that it would dictate a different conclusion." *Does #1-9*, 2023 WL 2335639, at *15. Indeed, Tennessee's geographic prohibitions are even broader than those of the Michigan law: registrants may not establish a residence, accept employment, or stand

---

going to parks "cruising" for new victims); *Belleau v. Wall*, 811 F.3d 929 (7th Cir. 2016) (examining statute requiring civilly committed repeat child molester to wear an ankle monitor upon release). Three do not examine geographic restrictions. *W.B.H.*, 664 F.3d 848 (11th Cir. 2011), *Am. C.L. Union of Nevada v. Masto*, 670 F.3d 1046 (9th Cir. 2012), and *Doe v. Settle*, 24 F.4th 932 (4th Cir. 2022) (examining registration requirements). Three examined residency restrictions materially narrower in scope than those in *Snyder. See Doe v. Miller*, 405 F.3d 700 (8th Cir. 2005) (residential but not work or loitering restriction and only as to schools/childcare facilities); *Vasquez v. Foxx*, 895 F.3d 515 (7th Cir. 2018) (residential but not work or loitering restriction and only as to schools, playgrounds, and childcare facilities); *Shaw v. Patton*, 823 F.3d 556 (10th Cir. 2016) (residential and loitering but not work restrictions); *McGuire v. Marshall*, 50 F.4th 986 (11th Cir. 2022) (residential and work but not loitering restriction and only as to schools/childcare facilities).

"idly" within 1,000 feet schools **and** licensed day care centers, other child

care facilities, public parks, playgrounds, recreation centers, and public ath-

letic fields "available for use by the general public." Tenn. Code Ann. § 40-

39-211(a)(1) & (d)(1)(B).

### 2.    The Act's classification scheme resembles shaming.

*Snyder* held the Michigan law's "requirements also resemble tradi-

tional shaming punishments" because the law "ascribes and publishes tier

classifications corresponding to the state' estimation of present dangerous-

ness without providing for any individualized assessment," those classifica-

tions are not based on "individual assessments, but solely on the crime of

conviction" and are "unappealable, and those classifications" apply even to

those whose offenses would not ordinarily be considered sex offenses." 834

F.3d at 698, 702–703. *Snyder* held that the "the ignominy under" the Michigan

law "flows not only from the past offense, but also from the statute itself."

*Id.* at 703.

The district court correctly held that the Act resembles traditional

shaming punishments to the same extent: "Tennessee's Act, like Michigan's,

57

is not an exact replica of traditional public shaming, but it bears meaningful similarities…Michigan's registration scheme did not expressly promote fact-to-face confrontations or humiliation any more than Tennessee's does. Nevertheless, the law did humiliate registrants and expose them to potential interpersonal confrontation, as the Act undoubtedly does in Tennessee." *Does #1-9*, 2023 WL 2335639, at *15. Indeed, the "tier" classifications that *Snyder* held resembled shaming are anodyne compared to the Tennessee Act's classification of some registrants as "violent sexual offenders" or "offenders against children."

Like the Michigan law's tier classifications, the Act's "violent sexual offenders" and "offenders against children" classifications express the "state's estimation of present dangerousness." Like the Michigan law, the Act imposes these classifications without any individualized assessment, based on solely on the crime of conviction, and without opportunity for appeal. Like the Michigan law, the Act even applies these classifications to offenses that do not have a sexual component, for example, false imprisonment or kidnapping of a child other than one's own, Tenn. Code Ann. § 40-39-

202(20)(a)(v) & (vi), and being an accessory after the fact, *id.* § 40-39-202(20)(a)(xv).

As the same district judge observed in another case, "[T]he phrase 'violent sexual offender,' when affixed to a person without explanation carries with it a significant stigma." *Reid v. Lee I*, 476 F. Supp. 3d at 707; *see, also, Doe #1*, 518 F. Supp. 3d at 1192 (holding that the Act, by labeling plaintiff "violent sexual offender," added ignominy "beyond the ignominy otherwise resulting from his convictions, considering the not-necessarily-violent nature of the offenses that landed him in this classification"). Likewise, the label "offender against children" "conveys ignominy additional to the ignominy associated with the minimum conduct suggested either by the fact that [Plaintiff] is a registrant, the fact that he committed the particular crime that made him a registrant, or the fact that he had one (and only one) child victim." *Id.* at 1194. Thus, like the Michigan law, "the ignominy under" the Tennessee

59

Act "flows not only from the past offense, but also from the statute itself."

*Reid Id.* at 703.[7]

### 3.    The Act's in-person registration and reporting requirements, geographical restrictions, and criminal sanctions resemble probation and parole.

Finally, *Snyder* held the Michigan law "resembles the punishment of parole/probation" because registrants are not "free to move where they wish and to live and work as other citizens, with no supervision" but instead "are subject to numerous restrictions on where they can live and work," must "report in person, rather than by phone or mail," can be "punished by imprisonment, not unlike a revocation of parole," for failure to comply, and are subject to a "level of individual supervision" that "is less than is typical of parole or probation" but whose "basic mechanism and effects have a great deal in common." 834 F.3d at 703.

---

[7] Defendants appear to claim *Cutshall* and *Bredesen* upheld this classification scheme because they upheld the publication of sex offender registry information, Brief at 43–45, but neither *Cutshall* nor *Bredesen* is on point for the reasons stated in Section IV(A) above.

The Act resembles parole and probation to the same extent because it imposes the extensive geographic restrictions detailed above; annual or quarterly in-person reporting[8], *id.* § 40-39-204(b) & (c); in-person reporting within 48 hours for changes of residence, establishing employment, or beginning school, *id.* § 40-39-203(a)(1); and reporting within 48 hours numerous other events, *e.g.*, change of job, change of vehicle, *id.* § 40-39-203(a)(4) & (6). Registrants may not leave the state without reporting 48 hours before or after and cannot leave the country without giving twenty-one days' notice, or 24 hours' notice if pre-approved or for an emergency. *Id.* § 40-39-203(a)(3), § 40-39-204(h). Like registrants under Michigan's law, registrants under the Act are not free to "move where they wish and to live and work as other citizens, with no supervision." *Snyder*, 834 F.3d. at 703 (cleaned up).

*    *    *

For all these reasons, the district court correctly held the first *Mendoza-Martinez* factor supports a finding of punitive effect.

---

[8] Defendants claim *Cutshall* and *Bredesen* upheld these requirements, Brief at 39, 41–42, but neither *Cutshall* nor *Bredesen* is on point the for the reasons stated in Section IV(A) above.

### C.    The Act imposes affirmative disabilities and restraints.

The second *Mendoza-Martinez* factor asks whether the statutory scheme "imposes an affirmative disability or restraint[.]" *Smith*, 538 U.S. at 97. *Snyder* held that Michigan's geographic restrictions, in-person reporting requirements, and lifetime registration requirement for Tier III offenders were "direct restraints on personal conduct." *Snyder*, 834 F.3d at 703. While these restraints were not physical, they were not "minor and indirect" because "failure to comply with these restrictions carries with it the threat of serious punishment, including imprisonment." *Id.*

The Act's geographic restrictions, in-person reporting requirements, and life-time registration requirement for "violent sexual offenders" and "offenders against children" are indistinguishable from those of Michigan's law and likewise impose "direct restraints on personal conduct" that are neither "minor" nor "indirect." *Id.* The district court correctly held the second *Mendoza-Martinez* factor supports a finding of punitive effect.

**D.    The Act seeks to incapacitate and deter offenders and imposes retribution for past acts.**

The third *Mendoza-Martinez* factor asks whether the statutory scheme "promotes the traditional aims of punishment[.]" *Smith*, 538 U.S. at 97. *Snyder* held that Michigan's law advanced the three traditional aims of punishment: incapacitation, retribution, and deterrence. 834 F.3d at 704. The law incapacitated offenders by keeping them away from opportunities to reoffend, the law was retributive because it applied to them based solely on past acts, and one of the law's express purposes was to deter recidivism. *Id.*

The same is true of the Act. *Snyder's* conclusion that the Michigan law "advanced all the traditional aims of punishment: incapacitation, retribution, and specific and general deterrence can simply be imported, effectively word-for-word, into an analysis of Tennessee's Act." *Does #1-9*, 2023 WL 2335639, at *17 (cleaned up). Like the Michigan law's, the Act's geographical restrictions incapacitate registrants, apply solely based on prior convictions, and serve the express purposes of deterring recidivism. Tenn. Code Ann. § 40-39-201(b)(1). The district court correctly held the third *Mendoza-Martinez* factor supports a finding of punitive effect.

**E.    The Act has only a tenuous connection to its nonpunitive purpose and is excessive to that purpose.**

The fourth and fifth *Mendoza-Martinez* factors ask whether the statutory scheme "has a rational connection to a nonpunitive purpose" and whether it "is excessive with respect to this purpose[.]" *Smith*, 538 U.S. at 97. *Snyder* held that Michigan's law bore only a tenuous connection to its nonpunitive purpose of preventing future acts of sexual violence. 834 F.3d at 704–705. *Snyder* noted "recent empirical evidence" had cast "significant doubt" on the claim that "risk of recidivism risk posed by sex offenders is frightening and high," including a study suggesting that "sex offenders (a category that includes a great diversity of criminals, not just pedophiles) are actually *less* likely to recidivate than other sorts of criminals." *Id.* at 704. *Snyder* pointed to another study concluding that sex offender registry laws "actually *increase* the risk of recidivism, probably because they exacerbate risk factors for recidivism by making it hard for registrants to get and keep a job, find housing, and reintegrate into their communities." *Id.* at 704–705.

*Snyder* pointed out that "Michigan has never analyzed recidivism rates despite having the data to do so." 834 F.3d at 705. *Snyder* also noted the lack

of empirical evidence "that residential restrictions have any beneficial effect on recidivism rates." *Id.* at 705. Finally, *Snyder* noted that Michigan's law made "no provision for individualized assessments of proclivities or dangerousness." *Id. Snyder* held the burdens imposed by the Michigan sex offender registry law were excessive in relation to its purpose because there was no evidence that the "difficulties the statute imposes on registrants" are counterbalanced by any positive effects." *Id.*

Assuming the Act has the same non-punitive purpose as the Michigan law in *Snyder*, it imposes equally heavy burdens that bear only a tenuous relationship to that purpose. As with the Michigan law, there is no evidence these heavy burdens prevent sexual violence; Defendants admitted as much. *Does #1-9*, 2023 WL 2335639, at *9. While Defendants claim the "fit between the regulatory means and ends…need not be the best choice possible to address the problem," Brief at 49, *Snyder* held the Michigan law excessive because its "efficacy is at best unclear" while "its negative effects are plain on the law's face." 834 F.3d at 705. Given the lack of any evidence of the Act's efficacy, the district court correctly held it was excessive under *Snyder. Does*

65

*#1-9*, 2023 WL 2335639, at \*17. Defendants also claim the district court should have judged the Act's efficacy based on statistics predating its enactment but concede *Snyder* did not so limit its review. *See* Brief at 49, 51. Plus, given the Act's multiple amendments since its original enactment, there is no reason why more recent information cannot be considered.

As with the Michigan law, the Act imposes its burdens on all offenders without any consideration of the relative risks they pose. As the district court held, "for the Act to qualify as a prophylactic, civil safety regime, there needs to be at least some tailoring of its restrictions to actual, demonstrable risks. Instead, the Act simply imposes its restrictions automatically on every person convicted by a jury of committing a certain type of criminal offense—in other words, like a punishment." *Does #1-9*, 2023 WL 2335639, at \*16. The district court correctly held the fourth and fifth *Mendoza-Martinez* factors support a finding of punitive effect.

\*    \*    \*

As the district court concluded, "What the plaintiffs have presented is a case that, in every meaningful way, falls squarely within the analysis of

66

*Snyder*….” *Does #1-9*, 2023 WL 2335639, at *17. The district court therefore correctly granted summary judgment holding the Act punitive in effect and unconstitutional as applied to Plaintiffs.

## V.    The scope and terms of the permanent injunction are proper.

### A.    The Act was not subject to elision.

Defendants claim the district court erred by enjoining enforcement of the Act as a whole instead of performing “enactment-by-enactment, provision-by-provision analysis,” enjoining only specific provisions, and determining whether prior versions of those provisions were enforceable. Brief at 54–55. The district court considered that approach and correctly held it was not proper under Tennessee law because it could not just “elide, or even rewrite, one or two provisions,” but would have to “reach into the statute and invent an entirely new category of offender, never contemplated by the General Assembly, who is subject to some provisions of the Act but not others— even though the provisions themselves make no such distinction.” *Id.*

State law governs severability. *Byrd v. Tennessee Wine & Spirits Retailers Ass’n*, 883 F.3d 608, 626 (6th Cir. 2018). The district court correctly held that

Tennessee law forbids elision "to completely re-write or make-over a statute." *Does #1-9,* 2023 WL 2335639, at 21 (quoting *State v. Crank,* 468 S.W.3d 15, 29 (Tenn. 2015)) (cleaned up); *see Doe v. Snyder,* 449 F. Supp. 3d 719, 733 (E.D. Mich. 2020) (finding elision improper as to Michigan's sex offender registry law on remand in *Snyder*).

### B.    The district court's injunction was sufficiently detailed.

Defendants claim the injunction does not "restrain Director Rausch's conduct in specific or detailed terms." Brief at 55 (cleaned up). But the language of the injunction is clear, Order, R. 135 at Page ID #2721–2722, and Defendants had no trouble implementing it by removing Plaintiffs' information from the registry, issuing them driver's licenses without a sex offender designation, notifying their former reporting agencies of their removal, and giving them letters on TBI letterhead, addressed to them using their true names, confirming they have no obligation to comply.[9] Defendants' claim is therefore implausible.

---

[9] Defendants have, so far, declined to stipulate to these post-judgment facts. If necessary, Plaintiffs will file a motion asking the Court to exercise its equitable power to supplement the record.

### C.    The district court properly weighed the public interest.

Last, Defendants claim the district court failed to weigh the "paramount public interest" in "protecting the public" from sexual offenders. Brief at 57. This claim fails because "no cognizable harm results from stopping unconstitutional conduct, so it is always in the public interest to prevent violation of a party's constitutional rights." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (cleaned up).

## VI.    The district court properly determined declaratory relief would complement injunctive relief.

Defendants mistakenly claim the district court's declaratory relief is an improper "advisory opinion coercing unnamed parties who never participated in this lawsuit." Brief at 57. Rather, it complemented the district court's injunction by notifying those who enforce the Act "in active concert or participation with" Defendants not to enforce the Act against Plaintiffs.

Under Fed. R. Civ. P. 65(d)(2), an injunction binds "the parties," "the parties' officers, agents, servants, employees, and attorneys," and "other persons in active concert or participation with" any of the foregoing. State and local officials enforce the Act in "active concert or participation with"

Defendants by collecting registering offenders, reporting their information to the TBI, and arresting and prosecuting non-compliant registrants. Defendants' suggestion that Plaintiffs should have sued all such officials, *see* Brief at 59, 60, is impractical and, under Fed. R. Civ. P. 65(2)(2), unnecessary.

Granting an injunction does not preclude granting declaratory relief if it is "otherwise appropriate." Fed. R. Civ. P. 57; 28 U.S.C. § 2201(a) (declaratory relief permitted where "further relief is or could be sought"). Given the Act's "diffusion of responsibilities" among multiple officials, declaratory relief appropriately complemented injunction injunctive relief by placing those officials on notice. *Does #1-9*, 2023 WL 2335639, at *22.[10]

---

[10] Plaintiffs do not understand Defendants' claim that declaratory relief forecloses "lawsuits that may or may not be brought by Tennessee's district attorneys." Brief at 61.

70

## CONCLUSION

For these reasons, the district court's judgment should be affirmed in all respects.

Dated: August 11, 2023.

Respectfully submitted:

*/s/ W. Justin Adams*
Edward M. Yarbrough
Jonathan P. Farmer
W. Justin Adams
SPENCER FANE LLP
511 Union Street, Suite 1000
Nashville, Tennessee 37219
Telephone 615-238-6300

Counsel for Appellees

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's type-volume limitations because it contains 12,369 words, excluding portions omitted from the Court's required word count.

This brief complies with the Court's typeface requirements because it has been prepared in Microsoft Word using fourteen-point Palatino Linotype.

/s/ W. Justin Adams

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2023, I electronically filed the fore-
going brief using the Court's electronic case filing system, which will send
notice of such filing to all parties registered to receive electronic notices in
this matter.

*/s/ W. Justin Adams*

## DESIGNATION OF RELEVANT DOCUMENTS

Plaintiffs adopt Defendants' designation of relevant documents and

supplement it as follows:

| Document | R. | Pages |
|---|---|---|
| Does' Prelim. Inj. Motion & Exs. | 35 | 170–276 |
| Does' #1-8s' Sealed Unredacted Declarations | 37 | 280–403 |
| Does' Am. Prelim. Inj. Motion & Ex. | 45 | 420–431 |
| Doe #9's Sealed Unredacted Declaration | 47 | 435–448 |
| Does' Opening Prelim. Inj. Brief | 48 | 449–473 |
| Lee & Rausch's Response Oppo. Prelim. Inj. & Exs. | 55 | 489–547 |
| Does' Prelim. Inj. Reply Brief & Exs. | 64 | 565–575 |
| Memorandum & Op. Granting Prelim. Inj. | 76 | 697–704 |